UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 00-CR-1162-KMM

UNITED STATES OF AMERICA

v.

JULIO DAVID ALFONSO,

Defendant.

_____/

## GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE PURSUANT TO 18 U.S.C. §3582(c)(1)(A)(i)

The United States of America, by and through the undersigned Assistant United States Attorney, hereby responds to defendant Julio David Alfonso's motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) (DE 127). This Court should deny the motion because the defendant has not met his burden of establishing that a sentence reduction is warranted under the statute.

### FACTUAL BACKGROUND

On December 29, 2000, a federal grand jury returned an indictment charging the defendant, with: conspiring to possess with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. §§ 841(b)(l)(A)(ii) and 846 (Count 1); attempting to possess with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. §§ 841(b)(l)(A)(ii), 846 and 18 U.S.C. § 2 (Count 2); conspiracy to commit armed robbery, in violation of 18 U.S.C. § 1951(a) (Count 3); attempting to commit armed robbery, in violation of 18 U.S.C. §§ 195l(a) (Count 4); conspiracy to carry a firearm in furtherance of a drug trafficking crime, in violation of

18 U.S.C. § 924(o) (Count 5); possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. §§ 924(c)(l) and 2 (Count 6); and possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(l) (Count 7) (DE 10). On March 9, 2001, the Government filed an information pursuant to 21 U.S.C. §§ 84l(b)(l)(A) and 85l(a), seeking to enhance the defendant's sentence based on a prior drug trafficking conviction (DE 31). On May 2, 2001, a jury convicted the defendant of all charges (DE 78). On August 2, 2001, the Court sentenced the defendant to concurrent sentences of: life imprisonment as to Counts 1 and 2; 240 months of imprisonment as to Counts 3, 4, and 5; 120 months of imprisonment as to Count 7; and 60 months of imprisonment as to Count 6 (DE 93).

## I.    BOP's Response to the COVID-19 Pandemic

As this Court is well aware, COVID-19 is an extremely dangerous illness that has caused many deaths in the United States in a short period of time and that has resulted in massive disruption to our society and economy. In response to the pandemic, BOP has taken significant measures to protect the health of the inmates in its charge.

BOP has explained that "maintaining safety and security of [BOP] institutions is [BOP's] highest priority." BOP, Updates to BOP COVID-19 Action Plan: Inmate Movement (Mar. 19, 2020), available at https://www.bop.gov/resources/news/20200319_covid19_update.jsp.

Indeed, BOP has had a Pandemic Influenza Plan in place since 2012. BOP Health Services Division, Pandemic Influenza Plan-Module 1: Surveillance and Infection Control (Oct. 2012), available at https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf. That protocol is lengthy and detailed, establishing a multi-phase framework requiring BOP facilities to begin

preparations when there is first a "[s]uspected human outbreak overseas." *Id*. at i. The plan addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates.

Consistent with that plan, BOP began planning for potential coronavirus transmissions in January. At that time, the agency established a working group to develop policies in consultation with subject matter experts in the Centers for Disease Control, including by reviewing guidance from the World Health Organization.

On March 13, 2020, BOP began to modify its operations, in accordance with its Coronavirus (COVID-19) Action Plan ("Action Plan"), to minimize the risk of COVID-19 transmission into and inside its facilities. Since that time, as events require, BOP has repeatedly revised the Action Plan to address the crisis.

BOP's operations are presently governed by Phase Ten of the Action Plan. The current modified operations plan requires that all inmates in every BOP institution be secured in their assigned cells/quarters, in order to stop any spread of the disease. Only limited group gathering is afforded, with attention to social distancing to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access. Further, BOP has severely limited the movement of inmates and detainees among its facilities. Though there will be exceptions for medical treatment and similar exigencies, this step as well will limit transmissions of the disease. Likewise, all official staff travel has been cancelled, as has most staff training.

All staff and inmates have been and will continue to be issued face masks and strongly encouraged to wear an appropriate face covering when in public areas when social distancing cannot be achieved.

Every newly admitted inmate is screened for COVID-19 exposure risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation. In addition, in areas with sustained community transmission, all facility staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone. A staff member with a stuffy or runny nose can be placed on leave by a medical officer.

Contractor access to BOP facilities is restricted to only those performing essential services (e.g. medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems. All volunteer visits are suspended absent authorization by the Deputy Director of BOP. Any contractor or volunteer who requires access will be screened for symptoms and risk factors.

Social and legal visits were stopped as of March 13, and remain suspended at this time, to limit the number of people entering the facility and interacting with inmates. In order to ensure that familial relationships are maintained throughout this disruption, BOP has increased detainees' telephone allowance to 500 minutes per month. Tours of facilities are also suspended. Legal visits will be permitted on a case-by-case basis after the attorney has been screened for infection in accordance with the screening protocols for prison staff.

Further details and updates of BOP's modified operations are available to the public on the BOP website at a regularly updated resource page: www.bop.gov/coronavirus/index.jsp.

In addition, in an effort to relieve the strain on BOP facilities and assist inmates who are most vulnerable to the disease and pose the least threat to the community, BOP is exercising greater authority to designate inmates for home confinement. On March 26, 2020, the Attorney General directed the Director of the Bureau of Prisons, upon considering the totality of the circumstances concerning each inmate, to prioritize the use of statutory authority to place prisoners in home confinement. That authority includes the ability to place an inmate in home confinement during the last six months or 10% of a sentence, whichever is shorter, *see* 18 U.S.C. § 3624(c)(2), and to move to home confinement those elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g). Congress has also acted to enhance BOP's flexibility to respond to the pandemic. Under the Coronavirus Aid, Relief, and Economic Security Act, enacted on March 27, 2020, BOP may "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" if the Attorney General finds that emergency conditions will materially affect the functioning of BOP. Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (to be codified at 18 U.S.C. § 3621 note). On April 3, 2020, the Attorney General gave the Director of BOP the authority to exercise this discretion, beginning at the facilities that thus far have seen the greatest incidence of coronavirus transmission. As of this filing, BOP has transferred 7,769 inmates to home confinement. *See See* BOP COVID-19 Home Confinement Information, at www.bop.gov/coronavirus/.

Taken together, all of these measures are designed to mitigate sharply the risks of COVID-19 transmission in a BOP institution. BOP has pledged to continue monitoring the pandemic and to adjust its practices as necessary to maintain the safety of prison staff and

inmates while also fulfilling its mandate of incarcerating all persons sentenced or detained based on judicial orders.

Unfortunately and inevitably, some inmates have become ill, and more likely will in the weeks ahead. But BOP must consider its concern for the health of its inmates and staff alongside other critical considerations. For example, notwithstanding the current pandemic crisis, BOP must carry out its charge to incarcerate sentenced criminals to protect the public. It must consider the effect of a mass release on the safety and health of both the inmate population and the citizenry. It must marshal its resources to care for inmates in the most efficient and beneficial manner possible. It must assess release plans, which are essential to ensure that a defendant has a safe place to live and access to health care in these difficult times. And it must consider myriad other factors, including the availability of both transportation for inmates (at a time that interstate transportation services often used by released inmates are providing reduced service), and supervision of inmates once released (at a time that the Probation Office has necessarily cut back on home visits and supervision).

## II.    The Defendant's Conviction and Request for a Sentence Reduction

On December 4, 2000, a confidential informant ("CI") informed law enforcement that two individuals later identified as the defendant and Marcos Enamorados were committing armed narcotics robberies while posing as police officers (PSI ¶ 3). On December 6, 2000, at the direction of law enforcement, the CI told the defendant and Enamorados that he knew a drug trafficker who was interested in setting up a "home invasion" drug rip-off (*id.* ¶ 4). The following day, an undercover law enforcement officer ("UC") called the defendant to arrange a meeting (*id.* ¶ 5). Later that same day, the UC met with the defendant and Enamorados and

discussed with them the possibility of stealing a shipment of 37 to 40 kilograms of cocaine from a "stash house" (*id.* ¶¶ 5-6). The defendant and Enamorados told the UC that they had committed similar robberies before while posing as police officers and agreed to rob the stash house, but only if they were armed (*id.* ¶ 8).

On December 19, 2000, the UC called the defendant and instructed him to meet with an "employee" — in reality a confidential informal ("CI2") — at a restaurant so that CI2 could lead them to the UC's "office" in preparation for robbing the stash house (*id.* ¶ 12). Later that evening, the defendant and Enamorados arrived at the restaurant in a vehicle driven by the defendant and followed CI2 to a warehouse in Miami (*id.* ¶¶ 13-14). Upon arrival, all three entered the warehouse to wait for the UC (*id.* ¶ 15). Shortly thereafter, Enamorados went back outside to the car, after which law enforcement officers announced their presence (*id.*). When police attempted to arrest Enamorados outside of the warehouse, he threw a loaded .357 Magnum revolver to the ground before submitting to the arresting officers (*id.*). When the defendant was arrested, he was wearing a black T-shirt with the word "police" written in large white letters on the front and back (*id.*). A search of the defendant also revealed a roll of silver duct tape in the pocket of his cargo pants (*id.*). A search of the vehicle driven by the defendant resulted in the recovery of a loaded .357 Magnum revolver under the driver's seat and a second black T-shirt with the word "police" written on the front and back in the rear passenger compartment (*id.* ¶ 16).

Subsequently, the defendant was convicted by a jury of: conspiring to possess with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. §§ 841(b)(l)(A)(ii) and 846 (Count 1); attempting to possess with intent to distribute five kilograms or more of cocaine,

in violation of 21 U.S.C. §§ 841(b)(l)(A)(ii), 846 and 18 U.S.C. § 2 (Count 2); conspiracy to commit armed robbery, in violation of 18 U.S.C. § 1951(a) (Count 3); attempting to commit armed robbery, in violation of 18 U.S.C. §§ 195l(a) (Count 4); conspiracy to carry a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(o) (Count 5); possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. §§ 924(c)(l) and 2 (Count 6); and possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(l) (Count 7) (DE 78).[1] The Court sentenced the defendant to concurrent sentences of: life imprisonment as to Counts 1 and 2; 240 months of imprisonment as to Counts 3, 4, and 5; 120 months of imprisonment as to Count 7; and 60 months of imprisonment as to Count 6 (DE 93). He now seeks compassionate release based on his underlying medical conditions and the COVID-19 pandemic (DE 127).

## LEGAL FRAMEWORK

Under 18 U.S.C. § 3582(c)(1)(A), this Court may, in certain circumstances, grant a defendant's motion to reduce his sentence. "[C]ompassionate release due to a medical condition is an extraordinary and rare event." *White v. United States*, 378 F.Supp.3d 784, 787 (W.D.Mo. 2019). The defendant "bears the burden of establishing that compassionate release is warranted." *United States v. Heromin*, 2019 WL 2411311, at *2 (M.D.Fl. 2019) (citing *United States v. Hamilton*, 715 F.3d 328, 327 (11th Cir. 2013), in which the court noted that a defendant bears the burden of establishing eligibility for a sentence reduction under Section 3582(c)(2)).

---

[1] Co-defendant Enamorados pled guilty (DE 70, 71) and was sentenced to a total of 212 months of imprisonment (DE 86).

Before filing a motion for compassionate release, the defendant must first request that BOP file such a motion on his behalf. § 3582(c)(1)(A). A court may grant the defendant's own motion for a reduction in his sentence only if the motion was filed "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or after 30 days have passed "from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *Id.* If that exhaustion requirement is met, a court may reduce the defendant's term of imprisonment "after considering the factors set forth in [18 U.S.C. § 3553(a)]" if the Court finds, as relevant here, that (i) "extraordinary and compelling reasons warrant such a reduction" and (ii) "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." § 3582(c)(1)(A)(i).

The Sentencing Commission has issued a policy statement addressing reduction of sentences under Section 3582(c)(1)(A) providing, as relevant here, that a court may reduce the term of imprisonment after considering the Section 3553(a) factors if the Court finds that (i) "extraordinary and compelling reasons warrant the reduction;" (ii) "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g);" and (iii) "the reduction is consistent with this policy statement." USSG § 1B1.13.

The policy statement includes an application note that specifies the types of medical conditions that qualify as "extraordinary and compelling reasons." First, that standard is met if the defendant is "suffering from a terminal illness," such as "metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, [or] advanced dementia." USSG § 1B1.13, cmt. n.1(A)(i). Second, the standard is met if the defendant is:

(I) suffering from a serious physical or medical condition,

9

> (II) suffering from a serious functional or cognitive impairment, or
> (III) experiencing deteriorating physical or mental health because of the aging process,
>
> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

USSG § 1B1.13, cmt. n.1(A)(ii). The application note also sets out what constitutes "extraordinary and compelling reasons" in light of the defendant's age: "[t]he defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less." USSG § 1B1.13, cmt. n.1(B). The application note also sets forth conditions and characteristics that qualify as "extraordinary and compelling reasons" related to the defendant's family circumstances, USSG § 1B1.13, cmt. n.1(C), and recognizes the possibility that BOP could identify other grounds that amount to "extraordinary and compelling reasons." USSG § 1B1.13, cmt. n.1(D). The BOP has issued a regulation defining its own consideration of requests for compassionate release. *See* https://www.bop.gov/policy/progstat/ 5050_050_EN.pdf. This program statement sets forth in detail BOP's definition of the circumstances that may support a request for compassionate release, limited to the same bases identified by the Sentencing Commission: medical condition, age, and family circumstances.

**ARGUMENT**

**I.       The Defendant Has Satisfied the Exhaustion Requirement.**

The defendant submitted his request for compassionate release to the Warden of his institution of confinement on June 19, 2020. The Warden denied that request on June 24, 2020.

Because more than 30 days have elapsed since the Warden received the defendant's request, he has satisfied the exhaustion requirement of Section 3582(c)(1)(A).[2]

## II.     The Court Should Deny The Motion Because Defendant Has Failed to Present Any "Extraordinary and Compelling Reasons" Warranting a Sentence Reduction.

As explained above, under the relevant provision of Section 3582(c), a court can grant a sentence reduction only if it determines that "extraordinary and compelling reasons" justify the reduction and that "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i). The Sentencing Commission's policy statement defines "extraordinary and compelling reasons" to include, as relevant here, certain categories of medical conditions. USSG § 1B1.13, cmt. n.1(A). To state a cognizable basis for a sentence reduction based on a medical condition, a defendant must establish that his condition falls within one of those specified categories, which include, as relevant here, (i) any terminal illness, and (ii) any "serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." USSG § 1B1.13, cmt. n.1(A). If a defendant's medical condition does not fall within one of the categories specified in the application note (and no other part of the application note applies), his motion must be denied.

Here, as reflected in the defendant's medical records (DE 127, Ex. B), the defendant does not suffer from a terminal illness. Nor do any of his medical conditions substantially diminish his ability "to provide self-care within the environment of a correctional facility." USSG 1B1.13,

---

[2]     After the passage of 30 days, the defendant is not required to exhaust administrative remedies following the denial of his request by the Warden. *See United States v. Gardner*, 2020 WL 1673315, at *1 (D. Minn. Apr. 6, 2020); *United States v. Carter*, 2020 WL 3458598, at *3-4 (S.D.W. Va. June 25, 2020).

cmt. n.1(A)(ii). Further, while the defendant is over 65 years old and has served more than 10 years of his term of imprisonment, he is not "experiencing a serious deterioration in physical or mental health because of the aging process." USSG § 1B1.13, cmt. n.1(B).

With respect to the COVID-19 pandemic, which poses a general threat to every non-immune person, the mere existence of that pandemic does not fall into either of the medical categories set forth in Comment Note 1(A) and therefore could not alone provide a basis for a sentence reduction. The categories encompass specific serious medical conditions afflicting an individual inmate, not generalized threats to the entire population. As the Third Circuit has held, "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release." *United States v. Raia*, 954 F.3d 594, 597 (3rd Cir. 2020). To classify COVID-19 as an extraordinary and compelling reason would not only be inconsistent with the text of the statute and the policy statement, but would be detrimental to BOP's organized and comprehensive anti-COVID-19 regimens, could result in the scattershot treatment of inmates, and would undercut the strict criteria BOP employs to determine individual inmates' eligibility for sentence reductions and home confinement.

That does not mean, however, that COVID-19 is irrelevant to a court's analysis of a motion under Section 3582(c)(1)(A). If an inmate has a chronic medical condition that has been identified by the CDC as elevating the inmate's risk of becoming seriously ill from COVID-19,[3] that condition may satisfy the standard of "extraordinary and compelling reasons." Under these circumstances, a chronic condition (*i.e.*, one "from which [the defendant] is not expected to

_____

[3] *See* Centers for Disease Control, *At Risk for Severe Illness*, *available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html.

recover") reasonably may be found to be "serious" and to "substantially diminish[] the ability of the defendant to provide self-care within the environment of a correctional facility," even if that condition would not have constituted an "extraordinary and compelling reason" absent the risk of COVID-19. USSG § 1B1.13, cmt. n.1(A)(ii)(I). But as part of its analysis of the totality of circumstances, the Court should consider whether the inmate is more likely to contract COVID-19 if he is released than if he remains incarcerated. That will typically depend on the inmate's proposed release plans and whether a known outbreak has occurred at his institution.

Here, the defendant does not have any medical condition that has been identified by the CDC as increasing the risks associated with COVID-19. While the defiant asserts that "he most certainly has a compromised Immune System," (DE 127:5), that claim is not supported by his medical records. While CDC guidance also states that the risk of getting severely ill from COVID-19 increases with age, age does not qualify by itself as an extraordinary and compelling reason. *See United States v. Bueno-Sierra*, 2020 WL 2526501, at *5 (S.D. Fla. May 17, 2020) (denying compassionate release to 72 year-old inmate with diabetes and hypertension who "does not allege that his health conditions are significantly deteriorating"); *United States v. La*, 2020 WL 2062145 (E.D. Cal. Apr. 29, 2020) (denying compassionate release to a 62 year-old inmate who "suffers from cervicalgia, or neck pain, low back pain, eczema, and bilateral shoulder pain" but whose medical records "do not support a finding of diminished self-care capacity"). Accordingly, the defendant cannot satisfy his burden of establishing extraordinary and compelling reasons warranting compassionate release.

**III.    The Defendant Still Poses a Danger to the Safety of the Community and the Section 3553(a) Factors Weigh Against His Release.**

Even if the defendant could establish extraordinary and compelling reasons warranting compassionate release, he cannot satisfy his burden of proving that he "is not a danger to the safety of any other person or to the community." USSG § 1B1.13(2). As set forth above, the defendant is serving a sentence of life imprisonment based upon his attempt to commit an armed robbery of narcotics. That was not a mandatory sentence. The defendant was a career offender (PSI ¶ 31), and his guideline range was 360 months to life imprisonment (PSI ¶ 74). The Court chose to impose a sentence at the high end of this range in light of the defendant's criminal history, which began within two years of his arrival in the United States and which his own attorney described as "horrendous" (DE 100:4-5). In light of his crime of conviction and his criminal history, the defendant has not, and cannot, satisfy his burden of establishing that he is no longer a danger to the community. *See United States v. Belle*, 2020 WL 2129412 (D.Conn. May 5, 2020) (notwithstanding asthma, compassionate release denied due to history of violence and firearms offenses); *United States v. Miranda*, 2020 WL 2124604 (D.Conn. May 5, 2020) (notwithstanding diabetes, compassionate release denied in light of history of drug crimes and threatened violence); *United States v. Esparza*, 2020 WL 1696084, at *2 (D. Idaho Apr. 7, 2020) (denying compassionate release for a 70 year old defendant who has served more than 12 years in prison and is experiencing a serious deterioration in physical health as he ages in light of his multiple prior drug convictions and leadership role in a substantial drug organization; "It would be foolish to assume that he is unlikely to return to peddling drugs at age 70.").

Moreover, the factors militating against a sentence reduction outweigh the defendant's asserted medical concerns related to COVID-19. Even if this Court concludes that the defendant has established "extraordinary and compelling reasons" for a sentence reduction based on the risk of contracting COVID-19, the defendant has not established that he would be less vulnerable to COVID-19 if released than if he remains incarcerated. The defendant has not offered any proposed release plan that would allow the Court to assess his risks of contracting COVID-19 if released. Further, while the defendant's medical records establish that all of his medical conditions are being well-managed by the BOP, the defendant does not provide the Court with any evidence that he would receive better medical care (or any medical care) if released from prison. The defendant's failure to provide this Court with any meaningful release plan is sufficient grounds to deny the motion. *See United States v. Allison*, 2020 WL 3077150, at *4 (W.D. Wash. June 10, 2020) ("An appropriate release plan is essential to ensure that a defendant actually has a safe place to live and access to health care in these difficult times. Shortening a defendant's sentence where there is no adequate release plan offers no benefit to the health of the inmate and in the process likely further endangers the community into which the defendant is release."); *United States v. Arthur Williams*, 2020 WL 3086049, at *2 (D. Mass. June 10, 2020) ("I find the thinly sketched release plan put forward by Williams's counsel to be impractical and unlikely to protect the public safety. . . . I also note that the release plan would take Williams out of a setting in which medical services are readily available to him and place him in one in which they may be difficult to obtain.").

## CONCLUSION

WHEREFORE, the Government respectfully requests that this Court deny the defendant's motion for compassionate release.

Respectfully submitted,

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY

By:   */s/ Sean Paul Cronin*
Sean Paul Cronin
Assistant United States Attorney
Court No.A5500940
99 N.E. 4th Street, Suite 400
Miami, FL 33132
Tel# (305) 961-9194
Fax: (305) 530-6168
Sean.P.Cronin@usdoj.gov

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on October 14, 2020, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF and caused a copy to be served by United States mail upon:

Julio David Alfonso, *pro se*
Reg. No. 66753-004
Coleman-Medium, Unit B-2
P.O. Box 1032
Coleman, FL 33521-1032

*/s/ Sean Paul Cronin*
Sean Paul Cronin
Assistant United States Attorney