UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 00-CR-1162-KMM

UNITED STATES OF AMERICA

v.

JULIO DAVID ALFONSO,

        **Defendant.**
_____/

**GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION
FOR COMPASSIONATE RELEASE PURSUANT TO 18 U.S.C. §3582(c)(1)(A)(i)**

The United States of America, by and through the undersigned Assistant United States Attorney, hereby responds to defendant Julio David Alfonso's second motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) (DE 136). In denying the defendant's first compassionate release motion, this Court held that the defendant had failed to demonstrate extraordinary and compelling reasons justifying his release (DE 131:5). Since the defendant filed his original motion, he contracted COVID-19 and recovered. Subsequently, he was vaccinated against the virus. Accordingly, the defendant cannot establish extraordinary and compelling reasons justifying his release.

**FACTUAL BACKGROUND**

**I.    The Defendant's Conviction**

On December 4, 2000, a confidential informant ("CI") informed law enforcement that two individuals later identified as the defendant and Marcos Enamorados were committing armed narcotics robberies while posing as police officers (PSI ¶ 3). On December 6, 2000, at the direction of law enforcement, the CI told the defendant and Enamorados that he knew a drug trafficker who was interested in setting up a "home invasion" drug rip-off (*id*. ¶ 4). The following day, an

undercover law enforcement officer ("UC") called the defendant to arrange a meeting (*id.* ¶ 5). Later that same day, the UC met with the defendant and Enamorados and discussed with them the possibility of stealing a shipment of 37 to 40 kilograms of cocaine from a "stash house" (*id.* ¶¶ 5-6). The defendant and Enamorados told the UC that they had committed similar robberies before while posing as police officers and agreed to rob the stash house, but only if they were armed (*id.* ¶ 8).

On December 19, 2000, the UC called the defendant and instructed him to meet with an "employee" — in reality a confidential informal ("CI2") — at a restaurant so that CI2 could lead them to the UC's "office" in preparation for robbing the stash house (*id.* ¶ 12). Later that evening, the defendant and Enamorados arrived at the restaurant in a vehicle driven by the defendant and followed CI2 to a warehouse in Miami (*id.* ¶¶ 13-14). Upon arrival, all three entered the warehouse to wait for the UC (*id.* ¶ 15). Shortly thereafter, Enamorados went back outside to the car, after which law enforcement officers announced their presence (*id.*). When police attempted to arrest Enamorados outside of the warehouse, he threw a loaded .357 Magnum revolver to the ground before submitting to the arresting officers (*id.*). When the defendant was arrested, he was wearing a black T-shirt with the word "police" written in large white letters on the front and back (*id.*). A search of the defendant also revealed a roll of silver duct tape in the pocket of his cargo pants (*id.*). A search of the vehicle driven by the defendant resulted in the recovery of a loaded .357 Magnum revolver under the driver's seat and a second black T-shirt with the word "police" written on the front and back in the rear passenger compartment (*id.* ¶ 16).

On December 29, 2000, a federal grand jury returned an indictment charging the defendant with: conspiring to possess with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. §§ 841(b)(l)(A)(ii) and 846 (Count 1); attempting to possess with intent to distribute

five kilograms or more of cocaine, in violation of 21 U.S.C. §§ 841(b)(l)(A)(ii), 846 and 18 U.S.C. § 2 (Count 2); conspiracy to commit armed robbery, in violation of 18 U.S.C. § 1951(a) (Count 3); attempting to commit armed robbery, in violation of 18 U.S.C. §§ 195l(a) (Count 4); conspiracy to carry a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(o) (Count 5); possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. §§ 924(c)(l) and 2 (Count 6); and possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(l) (Count 7) (DE 10). On March 9, 2001, the Government filed an information, pursuant to 21 U.S.C. §§ 84l(b)(l)(A) and 85l(a), seeking to enhance the defendant's sentence based on a prior drug trafficking conviction (DE 31). On May 2, 2001, a jury convicted the defendant of all charges (DE 78). On August 2, 2001, the Court sentenced the defendant to concurrent sentences of: life imprisonment as to Counts 1 and 2; 240 months of imprisonment as to Counts 3, 4, and 5; 120 months of imprisonment as to Count 7; and 60 months of imprisonment as to Count 6 (DE 93).

## II.   The Defendant's Request for Compassionate Release

On October 1, 2020, the defendant filed his first motion for compassionate release based on his underlying medical conditions and the COVID-19 pandemic (DE 127). The Court denied that motion on July 16, 2021 (DE 131). In that order, the Court "agree[ed] with the Government that Defendant . . . failed to demonstrate extraordinary and compelling reasons exist to justify his release" (*id*. at 5). The Court further found that "Defendant was sentenced as a career offender with a lengthy criminal history, and he does not demonstrate that he no longer poses a danger to the community. The Court finds that the original sentence imposed reflects the seriousness of the

offense, promotes respect for the law, provides just punishment, affords adequate deterrence to criminal conduct, and protects the public, all in accordance with § 3553(a)" (*id*. at 5-6).

On or about February 7, 2023, the defendant submitted a second request for compassionate release to the warden of his facility. The warden denied this request. On April 4, 2023, the defendant filed his second motion for compassionate release (DE 136). Thus, the government agrees that more than 30 days have passed since the defendant's request to the warden, and that he therefore has satisfied the administrative exhaustion requirement set forth in 18 U.S.C. § 3582(c)(1)(A).

The undersigned obtained the defendant's medical records for the past two years from the Bureau of Prisons ("BOP"), which will be filed under seal. The records reveal that the defendant, who is 73 years old, presents hypertension (high blood pressure), which appears well-controlled at this time with medication provided by the institution. The defendant is fully ambulatory and engages in all normal activities of daily living (ADLs). The defendant was diagnosed with COVID-19 on December 30, 2020. That diagnosis was resolved on January 8, 2021. The defendant has been fully vaccinated against COVID-19. He received doses of the Pfizer vaccine on May 9, 2022 and July 6, 2022.

### III. BOP's Response to the COVID-19 Pandemic

As the Court is aware, from the moment the pandemic began, the BOP made extensive changes to its operations, based on a plan that was prepared over many years, and refined in early 2020 in consultation with the Centers for Disease Control ("CDC") and the World Health Organization. Those efforts continue.

BOP worked with the CDC and the federal government's COVID-19 Vaccine/Therapeutics Operation (formerly known as Operation Warp Speed) to ensure that BOP

received the COVID-19 vaccines as they became available, and then offered the vaccines to all willing staff members and inmates, beginning first with staff members (who present a more likely vector for COVID-19 transmission into an institution), and then offering the vaccines to inmates in order of priority of need in accordance with CDC guidelines. As a court observed, "Since the vaccines became available, the Bureau of Prisons diligently and efficiently administered the doses allocated to it, leading all jurisdictions and Federal entities in its vaccine utilization rate." *United States v. Roper*, 2021 WL 963583, at *3 (E.D. Pa. Mar. 15, 2021) (Kearney, J.) (footnote omitted).

As of this writing, through an intensive effort over the past months, BOP has offered a vaccine to every inmate in BOP-managed institutions. BOP has administered a total of 349,733 doses to inmates and staff. Going forward, BOP will continue to offer vaccines to newly arrived inmates, and to those inmates who initially declined a vaccine if they change their minds, as expeditiously as possible as supplies are available.

As it relates to the defendant, BOP's aggressive efforts have extended to FCI Coleman Medium. That institution houses 1,498 inmates. Currently, there are no positive inmates and only one positive staff member at that institution.

## LEGAL FRAMEWORK

The compassionate release statute, 18 U.S.C. § 3582(c)(1)(A), as amended by the First Step Act on December 21, 2018, provides in pertinent part:

(c) Modification of an Imposed Term of Imprisonment.—The court may not modify a term of imprisonment once it has been imposed except that—

(1) in any case—

(A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of

probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—

(i) extraordinary and compelling reasons warrant such a reduction . . .

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

Further, 28 U.S.C. § 994(t) provides: "The Commission, in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of title 18, shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples. Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason."

The Sentencing Guidelines policy statement appears at § 1B1.13. It provides that the Court may grant release if "extraordinary and compelling circumstances" exist, "after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable," and the Court determines that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)".

In application note 1 to the policy statement, the Commission identifies the "extraordinary and compelling reasons" that may justify compassionate release. The note provides as follows:

1. Extraordinary and Compelling Reasons.—Provided the defendant meets the requirements of subdivision (2) [regarding absence of danger to the community], extraordinary and compelling reasons exist under any of the circumstances set forth below:

(A)  Medical Condition of the Defendant.—

    (i)  The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

    (ii)  The defendant is—

6

        (I)        suffering from a serious physical or medical condition,

        (II)       suffering from a serious functional or cognitive impairment, or

        (III)     experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(B)    Age of the Defendant.—The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

(C)    Family Circumstances.—

    (i)    The death or incapacitation of the caregiver of the defendant's minor child or minor children.

    (ii)   The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

(D)    Other Reasons.—As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

In general, the defendant has the burden to show circumstances meeting the test for compassionate release. *See, e.g.*, *United States v. Neal*, 2020 WL 5993290, at *4 (E.D. Pa. Oct. 9, 2020) (Gallagher, J.); *United States v. Adeyemi*, 2020 WL 3642478, at *16 (E.D. Pa. July 6, 2020) (Kearney, J.). As the terminology in the statute makes clear, compassionate release is "rare" and "extraordinary." *United States v. Willis*, 382 F. Supp. 3d 1185, 1188 (D.N.M. 2019) (Johnson, J.) (citations omitted).

# ARGUMENT

I. **COVID-19 and Compassionate Release**

The fact of the COVID-19 pandemic, which poses a general threat to every non-immune person in the country, does not alone provide a basis for a sentence reduction. The guideline policy statement describes specific serious medical conditions afflicting an individual inmate, not generalized threats to the entire population. The Third Circuit therefore held: "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020).

The government acknowledges, however, that an inmate who has not been offered a vaccine, who presents a risk factor identified by the CDC as increasing the risk of an adverse outcome from COVID-19,[1] and who is not expected to recover from that condition, presents "a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility" U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I), as, due to his condition, the defendant may be less able to protect himself against an unfavorable outcome from the disease. *See United States v. Tartaglione*, 2020 WL 3969778, at *5-6 (E.D. Pa. July 14, 2020) (Slomsky, J.) ("a prisoner seeking release due to COVID-19 must at least show: (1) a sufficiently serious medical condition, or advanced age, placing the prisoner at a uniquely high risk of grave illness or death if infected by COVID-19; and (2) an actual, non-speculative risk of exposure to COVID-19 in the facility where the prisoner is held" (quoting

---

[1] The CDC's list of risk factors appears at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html. It reports a list of conditions that "can make you more likely to get very sick from COVID-19."

8

*United States v. Somerville*, 463 F. Supp. 3d 585, 597 (W.D. Pa. 2020) (Ranjan, J.)). *See also United States v. Elias*, 984 F.3d 516, 521 (6th Cir. 2021) (affirming denial of compassionate release and observing that "the district court properly considered the CDC guidance that was in effect at the time . . . . Relying on official guidelines from the CDC is a common practice in assessing compassionate-release motions.").

**II.     The Defendant's Circumstances**

Here, the only risk factor that the defendant presents is hypertension. The CDC has consistently indicated that there is insufficient evidence to conclude that hypertension places a person at a greater risk of a severe outcome from COVID-19. The CDC previously stated that hypertension "might" present a risk, and more recently stated that it "possibly" can make a person more prone to severe illness, as distinct from many other conditions that the CDC states can make severe illness more likely.[2] Accordingly, the Eleventh Circuit Court of Appeals has upheld the denial of compassionate release when hypertension is the only potential risk factor presented. *See United States v. Harris*, 989 F.3d 908, 912 (11th Cir. 2021) (the district court did not abuse its discretion in denying relief where the defendant presented hypertension, which is classified by the CDC as only possibly presenting a risk); *United States v. Jackson*, 847 Fed.Appx. 792, 796 (11th Cir. 2021) (as the risk of severe disease for one suffering from hypertension "is only potentially higher," the district court did not abuse its discretion in denying relief).

In any event, the defendant's hypertension can no longer present an "extraordinary and compelling reason" because he has been vaccinated. As the government has explained, the pertinent guideline policy statement treats as an "extraordinary and compelling" circumstance "a

---

[2] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html

serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13 app. note 1(A)(ii). The government during the pandemic has acknowledged that an unvaccinated inmate who presents a medical risk factor identified by the CDC as increasing the risk of an adverse outcome from COVID-19, and who is not expected to recover from that condition, presents an extraordinary and compelling circumstance under that provision. That circumstance now does not exist, as the available vaccines permit effective self-care against severe illness or death that may be caused by the coronavirus. Accordingly, once a vaccine is available to an inmate, compassionate release is not warranted based on the threat of COVID-19 alone. As the Seventh Circuit Court of Appeals recently held:

> COVID-19 has been a fact of life for more than three years. For prisoners who have received a vaccine, the risk of serious complications should they develop a breakthrough infection is modest. Vaughn has not provided or pointed to any medical data suggesting that his combination of conditions puts him at serious risk should he develop a breakthrough infection. Likewise he has not provided any data suggesting that he is at greater risk of a dire outcome inside prison than he would be outside—and if he would remain at comparable risk outside prison, the possibility of infection cannot be described as an "extraordinary and compelling" consideration supporting release. (The statute conditions compassionate release on "extraordinary and compelling reasons".)
>
> The vaccination rate among federal prisoners and guards is substantial, and for all we can tell prisoners today are safer inside than they would be outside.

*United States v. Vaughn*, 62 F.4th 1071, 1071-1072 (7th Cir. Mar. 15, 2023); *see also United States v. Lemons*, 15 F.4th 747, 751 (6th Cir. 2021) ("a defendant's incarceration during the COVID-19 pandemic—when the defendant has access to the COVID-19 vaccine—does not present an 'extraordinary and compelling reason' warranting a sentence reduction."); *United States v. Thomas*, 2022 WL 296594, at *2 (3d Cir. Feb. 1, 2022) (unreported) ("The District Court

10

appropriately recognized that Thomas's vaccination reduced the health risks he relied on in support of his motion.").

It also bears noting that the defendant contracted COVID-19 and, fortunately, apparently recovered from it without significant consequence. The large majority of courts to address the matter have concluded that the risk of severe COVID-19 disease is mitigated following recovery from the virus and compassionate release is not justified, particularly when the inmate was subsequently vaccinated. *See United States v. Battle*, 2021 WL 4550925, *2 (3d Cir. Oct. 5, 2021) (unreported) ("While Battle has some health conditions that might put him at increased risk of a poor outcome if he were reinfected with COVID-19, the District Court properly noted that, at the time of its decision, infection rates were near zero in Battle's place of confinement, and Battle was completely vaccinated, giving him significant protection against reinfection. Given those facts, Battle did not make the threshold showing that 'extraordinary and compelling reasons' supported his release."); *United States v. Jefferson*, 2021 WL 4279626, at *2 (3d Cir. Sept. 21, 2021) (unreported) ("considering that Jefferson had contracted and recovered from COVID-19 and had been vaccinated, 'circumstances had shifted to make Jefferson's case for release based on the covid threat much less compelling than it had been initially.'" The Court of Appeals concluded: "The District Court did not err by declining to grant relief because Jefferson did not show that he is at a greater risk of infection or that FCI Allenwood places him at a heightened risk. This is particularly true considering the high rates of vaccination among the inmate population and the staff at FCI-Allenwood.").

### III. A Non-Retroactive Change in Sentencing Law Does Not Constitute Extraordinary and Compelling Reasons Warranting a Sentence Reduction.

The defendant's argument that the Court has the discretion to reduce his sentence based on changes in the law that do not have retroactive effect in the wake of *Concepcion v. United States*,

142 S.Ct. 2389 (2022), is misplaced. In *Conception*, the Supreme Court decided "which factors, besides the changes to the crack-cocaine sentencing ranges, a district court may consider in deciding whether to exercise its discretion to reduce a sentence for a covered offense under the First Step Act." *United States v. Jackson*, 58 F.4th 1331, 1335 (11th Cir. 2023). *Concepcion* has no bearing on the threshold question of whether a defendant qualifies for a sentencing reduction under the First Step Act.

> *Concepcion's* holding does not address compassionate release motions. . . . Importantly, the *Concepcion* opinion states that Congress may cabin what district courts may consider when sentencing (or resentencing) a defendant, and it expressly cited the compassionate release statute as an example: "For [§ 3582(c)] proceedings, Congress expressly cabined district courts' discretion by requiring courts to abide by the Sentencing Commission's policy statements."

*United States v. Beckford*, 2022 WL 4372553, at *3 (11th Cir. September 22, 2022) (unreported) (*quoting Concepcion*, 142 S.Ct. at 2401). Thus, *Concepcion* undermines defendant's argument that intervening changes in law can constitute compelling and extraordinary reasons for compassionate release. *See United States v. King*, 40 F.4th 594, 596 (7th Cir. 2022)("*Concepcion* is about the matters that district judges may consider when they resentence defendants. So understood, *Concepcion* is irrelevant to the threshold question whether any given prisoner has established an 'extraordinary and compelling' reason for release."); *United States v. McCall,* 56 F.4th 1048, 1061-62 (6th Cir. 2022) ("*Concepcion*'s insight goes to what a court may consider *after* it finds a defendant meets the threshold requirement for a sentence modification. If that threshold is met, *Concepcion* teaches that a district court may consider any number of changes in law and fact when exercising its discretion to grant or deny the defendant's motion. Our approach to compassionate release runs a parallel course. A defendant must first satisfy the provision's threshold requirement, showing some [ ] 'extraordinary and compelling reason' justifies a sentencing reduction. With that hurdle cleared, *Concepcion*'s holding comes into play. A district

court may consider subsequent developments, legal or factual, in deciding whether to modify the original sentence and, if so, in deciding by how much.")(emphasis in original; internal citations and quotations omitted); *United States v. Jenkins*, 50 F.4th 1185, 1200 (D.C.Cir. 2022).

IV. **The Defendant Still Poses a Danger to the Safety of the Community and the Section 3553(a) Factors Weigh Against His Release.**

Even if the defendant could establish extraordinary and compelling reasons warranting compassionate release, he cannot satisfy his burden of proving that he "is not a danger to the safety of any other person or to the community," USSG § 1B1.13(2), as the Court noted in denying the prior motion for compassionate release (DE 131:5-6). As set forth above, the defendant is serving a sentence of life imprisonment based upon his attempt to commit an armed robbery of narcotics. That was not a mandatory sentence. The defendant was a career offender (PSI ¶ 31), and his guideline range was 360 months to life imprisonment (PSI ¶ 74). The Court chose to impose a sentence at the high end of this range in light of the defendant's criminal history, which began within two years of his arrival in the United States and which his own attorney described as "horrendous" (DE 100:4-5). In light of his crime of conviction and his criminal history, the defendant has not, and cannot, satisfy his burden of establishing that he is no longer a danger to the community. *See United States v. Belle*, 457 F.Supp.3d 134 (D.Conn. 2020) (notwithstanding asthma, compassionate release denied due to history of violence and firearms offenses); *United States v. Miranda*, 457 F.Supp.3d 141 (D.Conn. 2020) (notwithstanding diabetes, compassionate release denied in light of history of drug crimes and threatened violence); *United States v. Esparza*, 2020 WL 1696084, at *2 (D. Idaho 2020) (unreported) (denying compassionate release for a 70 year old defendant who has served more than 12 years in prison and is experiencing a serious deterioration in physical health as he ages in light of his multiple prior drug convictions and

13

leadership role in a substantial drug organization; "It would be foolish to assume that he is unlikely to return to peddling drugs at age 70.").

Moreover, the factors militating against a sentence reduction outweigh the defendant's asserted medical concerns related to COVID-19. Even if this Court concludes that the defendant has established "extraordinary and compelling reasons" for a sentence reduction based on the risk of contracting COVID-19, the defendant has not established that he would be less vulnerable to COVID-19 if released than if he remains incarcerated. The defendant has not offered a proposed release plan that would allow the Court to assess his risks of contracting COVID-19 if released. Further, while the defendant's medical records establish that all of his medical conditions are being well-managed by the BOP, the defendant does not provide the Court with any evidence that he would receive better medical care (or any medical care) if released from prison. The defendant's failure to provide this Court with any meaningful release plan is sufficient grounds to deny the motion. *See United States v. Allison*, 2020 WL 3077150, at *4 (W.D.Wash. 2020) (unreported) ("An appropriate release plan is essential to ensure that a defendant actually has a safe place to live and access to health care in these difficult times. Shortening a defendant's sentence where there is no adequate release plan offers no benefit to the health of the inmate and in the process likely further endangers the community into which the defendant is release."); *United States v. Williams*, 2020 WL 3086049, at *2 (D. Mass. 2020) (unreported) ("I find the thinly sketched release plan put forward by Williams's counsel to be impractical and unlikely to protect the public safety. . . . I also note that the release plan would take Williams out of a setting in which medical

services are readily available to him and place him in one in which they may be difficult to obtain.").[3]

## CONCLUSION

WHEREFORE, the Government respectfully requests that this Court deny the defendant's motion for compassionate release.

Respectfully submitted,

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

By: */s/ Sean Paul Cronin*
Sean Paul Cronin
Assistant United States Attorney
Court No.A5500940
99 N.E. 4th Street, Suite 400
Miami, FL 33132
Tel# (305) 961-9194
Fax: (305) 530-6168
Sean.P.Cronin@usdoj.gov

---

[3] It appears that if the defendant was released from BOP custody, he would be released to the custody of Immigration and Customs Enforcement ("ICE") as a criminal alien (DE 136:26). This further weighs against granting compassionate release. *See United States v. Chavarin-Parra*, 2020 WL 5518467, at *3 (E.D. Cal. 2020) (unreported) ("Defendant has not identified a viable release plan. Instead, it is likely that if released Defendant will go directly into ICE custody. If so, Defendant would go from the frying pan to the fire, so to speak, with no real justification.").

15

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on April 18, 2023, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF and caused a copy to be served by United States mail upon:

Julio David Alfonso, *pro se*
Reg. No. 66753-004
Coleman-Medium, Unit B-2
P.O. Box 1032
Coleman, FL 33521-1032

                          */s/ Sean Paul Cronin*
                          Sean Paul Cronin
                          Assistant United States Attorney